THE PENNSYLVANIA COMPANY FOR BANKING AND TRUSTS (FORMERLY THE PENNSYLVANIA COMPANY FOR INSURANCE ON LIVES AND GRANTING ANNUITIES) *vs.*

BOARD OF GOVERNORS OF THE LONDON HOSPITAL *et al.*

OCTOBER 29, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

BAKER, J. This bill in equity was brought by a trustee under a will primarily for instructions relative to a distribution of a portion of the trust. When the cause was ready for hearing for the entry of final decree in the superior court it was certified to this court for determination in accordance with general laws 1938, chapter 545, §7.

The following facts among others appear from the bill of complaint, the respondents' answers thereto, a stipulation of facts signed by all parties except the attorney general of this state, and affidavits introduced as exhibits at the hearing in the superior court. The complainant is trustee under the will of Alexander G. Mercer, late of the city of Newport in this state, deceased, hereinafter referred to as the testator. The respondents, in addition to the attorney general, are two English hospitals, namely, the Governors of the London Hospital and The Elizabeth Garrett Anderson Hospital, hereafter sometimes termed

the original hospital corporations; the Board of Governors of the London Hospital and the Board of Governors of The Royal Free Hospital, respectively the statutory successors to said original hospital corporations, hereinafter referred to as the successor or new boards; and The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America and the Board of Home Missions of the Presbyterian Church in the United States of America, hereinafter referred to as the respondent churches. Adversary claims to the part of the trust now ready for distribution are made by the English hospitals and by the respondent churches.

Alexander G. Mercer died November 3, 1882 leaving a holographic will which was admitted to probate in Newport December 4, 1882. Anna Pell qualified as sole executrix under the will. By Section IX of that instrument the testator provided that all his property, over and above gifts made in the preceding sections of the will, be divided into thirty shares to be held and managed by the complainant company in trust to pay the interest thereon to certain specific persons for the term of their natural lives.

Section X of the will further provided, among other things, that upon the death of the last of the persons entitled to receive such interest the complainant trustee should pay from the capital and the accumulated income of the trust two thirds thereof for certain designated charitable purposes. The construction of the testator's will in relation thereto was before this court in the case of *Pennsylvania Co. for Insurances on Lives, Etc.* v. *Contributors to Pennsylvania Hospital,* 63 R. I. 466. The proper disposition of the undistributed portion of the remaining third is now in issue before us. Section X contains the following language concerning that part of the estate:

"(3rd) one third (⅓) of said property to go to such works of Religion or Benevolence as my Executors after full consideration shall select."

In addition the material portion of Section XI of the will is as follows:

"Section XI   I appoint the Boards of Domestic Missions in the Protestant Episcopal & Presbyterian Churches in the United States my residuary legatees so that in case any of my preceding gifts, specially my gifts to Public purposes should fail (for any reason now unimaginable by me) my property shall surely go, in such event, to the work of establishing the Knowledge & following of Jesus Christ among our American People.   But in case there is no failure as to my purposes in the preceding bequests and so these residuary legatees receive no substantial amount—then I call the attention of my executors to these two Boards aforesaid as a proper object for the whole or a part of the third of my property which I have left to their appropriation for Relig: or Benevolent purposes—as aforesaid."

In 1883 the executrix filed a bill in equity requesting certain instructions in regard to the testator's will.   One question related to the selection of the works of religion and benevolence above referred to.   The opinion of the court respecting that bill is reported in *Pell* v. *Mercer,* 14 R. I. 412, and a decree was entered therein May 19, 1884, the pertinent paragraph of which reads as follows:

"Fifth.   That the bequest of one-third of said estate in remainder to 'such works of religion or benevolence as the executors of said will after due consideration shall select' is a valid bequest and that the said selection shall be made by the said complainant by a scheme to be laid before the special master of this court hereinafter named on notice to the defendants herein and by him submitted to this court for its approval; which said scheme when so approved shall be a valid execution of the said power after notice to the defendants herein."

Accordingly the executrix thereafter selected certain works of religion and benevolence by a scheme which was laid before the special master appointed by this court.   He approved her selections and submitted them to the court

for its confirmation which was given by a decree entered October 17, 1884. The parts of the scheme material in the present cause are as follows:

"Sixth. One-quarter of the said remainder of the said one-third to 'The London Hospital,' a corporation established by Royal Charter under the laws of England, near the City of London, in the County of Middlesex, in the Kingdom of Great Britain and Ireland, to hold the same to it the said 'The London Hospital' and its successors, for the establishment and maintenance of the said hospital and its wards and beds, or in the discretion of the Governing Board of the said corporation to establish and maintain a hospital for convalescents, either in or near the said City of London, or in or near any other town or place in England, or in the discretion of the said Governing Board to establish a hospital for all or any of the aforesaid purposes in any part of England or Wales, always provided that any such hospital ward or beds shall always be for the use of the necessitous poor of England, without distinction as to religion, class, race, sex or place of birth.

"Seventh. One twelfth of the said remainder of said one third to the New Hospital for Women, at present occupying the house No. 222 Marylebone Road in the County of Middlesex, but in case the last mentioned hospital shall at the time when the said bequest becomes available for use have ceased to exist, or to .have for its objects, or one of its objects, the medical treatment of women and children by legally qualified medical women, then I direct that the share of the said one-third which is given to it herein, shall be added to the share given to the said 'The London Hospital' to be devoted and appropriated to and for such charitable purposes as the Governing Board for the time being of the said 'London Hospital' shall in their absolute discretion think proper."

On November 24, 1885 the executrix, acting in that capacity and pursuant to said decree and approved scheme, executed a deed of trust conveying to the complainant as

trustee under the testator's will all personal property remaining in his estate.

The last survivor of the life beneficiaries named in Section IX of the will died March 2, 1938 and the trust together with its accumulations then became distributable. Owing to the nature of the property held, the entire distribution could not then be made. Under a bill in equity which was filed in the superior court June 6, 1939 a decree was entered in that court authorizing the trustee to make payments from the trust to the Governors of the London Hospital and to The Elizabeth Garrett Anderson Hospital, the then corporate name for the New Hospital for Women, and to retain such properties for disposition as might be advantageous to the trust estate, and to make distribution from time to time thereafter. On July 25, 1945 the trustee filed a further account showing receipts and disbursements from January 30, 1940 to May 12, 1945, and a supplemental account to January 5, 1946. Certain assets from the trust are now in the hands of the complainant trustee awaiting distribution.

In 1946 the Parliament of Great Britain passed an act entitled "National Health Service Act, 1946," L. R. Stat. 1946, chap. 81, hereinafter referred to as the health act. By its terms the "appointed day" when the act became effective was July 5, 1948. It contains many sections and deals with numerous subjects which are "designed to secure improvement in the physical and mental health of the people of England and Wales and the prevention, diagnosis and treatment of illness * * *." Portions thereof which bear upon the questions before us will be referred to more fully. In general the purpose of the health act is to establish a comprehensive health service for England and Wales. Under the act unusually broad powers are given to the minister of health in connection with his administration thereof and his control over funds and property of the hospitals.

In substance the effect of the act was to nationalize practically all the English hospitals. This is clear from statements in *In re Bland-Sutton's Will Trusts*, L. R. 1 Ch. (1951) 485. There at page 493 the position of the English hospitals under the health act is described as follows: "On July 5, 1948, as is well known, the position of all the English hospitals was substantially changed by the coming into operation, as regards them, of the National Health Service Act, 1946." And at page 495 it is stated: "These results were in accordance with the scheme of the Act, described in its title as an Act to provide for the establishment of a comprehensive health service for England and Wales. Thereby all the hospitals in England and Wales, both voluntary and of the local authorities (subject only to exceptions immaterial for present purposes), and all their property rights and liabilities vested on July 5, 1948, in the Minister of Health with the exception that in the case of hospitals designated as teaching hospitals * * * their endowments then vested not in the Minister but in new boards of governors for such hospitals, wholly subject to the Minister's control."

It is the contention of the respondent churches in substance that because of the provisions of the above act, which transferred the control, management and financing of the hospitals involved to instrumentalities of the English government, the testator's gifts to such hospitals are incapable of fulfillment and therefore fail under the terms of the will and trust. Such respondents also argue that as residuary legatees under the will they are entitled to the distribution of the trust which the complainant is now prepared to make. On the other hand, the respondent English hospitals, both the original corporations and the successor boards, maintain that the act does not cause a failure of the gifts in question and that either the original corporations or the successor boards should properly receive the distribution of the trust according to the will and the

scheme approved by the decree of this court. These last-named respondents further urge that if this court does not agree with their above-stated position it should hold that the doctrine of *cy pres* is applicable and remand the cause to the superior court for appropriate action.

As we understand it, the respondent churches do not seriously question the contention of the hospitals that if the interest or right which the original hospital corporations may have had in the trust provided by the testator's will and the approved scheme thereunder were absolute, then such interest or right was intended to pass and probably did pass to the minister of health or to the successor boards by virtue of certain provisions of the health act. But such churches point out that the approved scheme did not give to the original hospital corporations gifts coupled with absolute freedom of use in the donees. We agree with the contention last mentioned because paragraphs numbered sixth and seventh of the decree of this court entered in 1884, which have been hereinbefore set out, show clearly that particular purposes, conditions and limitations were attached to the essence of the remainder interests which were later to pass to those beneficiaries and therefore that the gifts were not absolute.

We are here dealing with a Rhode Island will, trust and estate. In our opinion, before ordering a distribution of the trust, it is our primary duty to be as certain as is reasonably possible that the terms of the testator's will and of the trust set up thereunder by virtue of the approved plan of the executrix will be fully complied with by the beneficiaries thereof, and that a charitable gift for certain designated uses will not be diverted or applied otherwise. This principle of effectuating the testator's intent, if reasonably possible, prevails generally in the United States. 3 Scott on Trusts §337, p. 1834. *Pennsylvania Co. for Insurances on Lives, Etc.* v. *Contributors to Pennsylvania Hospital, supra; St. Joseph's Hospital* v. *Bennett,* 281 N. Y. 115. See also on

this point *City of Providence* v. *Payne*, 47 R. I. 444. Ordinarily in circumstances corresponding to those presented here, parts of an act passed in the jurisdiction in which any similar beneficiary is located will not be given effect by this court if that would prevent the carrying out by the beneficiary of the express and intended purposes of a charitable gift under such will or trust, or if it would permit the beneficiary to make some other and different disposition thereof.

In order to determine the issues before us it is necessary to consider what effect the passage of the health act has upon the present distribution of the trust, having in mind the general principles of law above referred to regarding our duty in the premises. Without going into unnecessary detail, a careful examination of that act shows, at least as far as hospitals are concerned, that comprehensive power is given to the minister of health and to the boards and committees under his control in respect to the property, funds, rights, management and administration of those institutions. From so-called autonomous voluntary charities they are transformed by legislative act into instrumentalities of the government.

Running through the act there appears to be emphasis placed on the use of trust funds for the promotion of medical research and for the furnishing of services for patients, sections 7 (2) and 59 (1), instead of for the ordinary and usual expenses of operating and maintaining a hospital. Section 11 (8) of the act relates to the designation by the minister of health of teaching hospitals and the appointment of boards of governors to administer them. The English hospitals involved herein have been designated as teaching hospitals, that is to say, comprising with other hospitals a single group. For example, the respondent, The Elizabeth Garrett Anderson Hospital, is one of the group entitled "Board of Governors of The Royal Free Hospital." Section 11 (8) contains the following language: "* * * and any group of hospitals so designated shall * * * be deemed

for the purposes of this Act to be a single hospital." See also sections 11 (9) and 12 (3).

The board of governors of a teaching hospital consists of a chairman appointed by the minister of health and such number of other members as the minister thinks fit. Third Schedule, Part III. It further appears in the act that the minister of health may repeal or amend any local or private act or charter containing provisions inconsistent with or redundant to the terms of such health act, section 77 (1), (2), and that governing bodies of voluntary hospitals which have been transferred to the minister of health by virtue of the act and whose functions have ceased are dissolved, section 78 (1).

The transfer to, and the vesting of property of a voluntary hospital in, the minister of health or in certain new boards of governors or management committees are apparently covered by sections 6, 7 and 60, of the act. Section 6 deals only with interests in the premises and in the equipment, furniture or other movable property used therein. Section 7 applies only to the endowments of a teaching hospital or one of a group of hospitals so designated, which endowments are transferred to and vest in the board of governors thereof. The term endowments is defined in such section, which also provides that an equitable interest in trust property which is held for the purposes of a voluntary hospital and in which there are other equitable interests shall not be deemed to be an endowment of that hospital. It is provided in both sections 6 and 7 that property vesting thereunder in the minister of health or in a board of governors shall do so free of any trust.

Section 60 of the act reads in part as follows:

"(1) Where property, other than property transferred to the Minister or to the Board of Governors of a teaching hospital or to a Hospital Management Committee under section six or section seven of this Act, is held on trust immediately before the appointed day, and the terms of the trust instrument authorise or require the trustees, whether immediately or in the

future, to apply any part of the capital or income of the trust property for the purposes of any hospital to which section six of this Act applies, the trust instrument shall be construed as authorising or, as the case may be, requiring the trustees to apply the trust property, to the like extent and at the like times, for the purpose of making payments, whether of capital or income—

(a) in the case of a hospital designated as a teaching hospital or included in a group of hospitals so designated, to the Board of Governors of that teaching hospital;

(b) * * *.

(2) Any sums paid as aforesaid to any such Board or Committee shall, *so far as practicable,* be applied by them for the purposes specified in the trust instrument." (italics ours)

It seems plain that the property and rights with which we are concerned, namely, the distribution of a portion of the trust created by the testator's will and by the approved scheme selected by his executrix, do not pass to or vest in the minister of health or in any board or committee described in the act by reason of the provisions of sections 6 and 7 thereof. These provisions do not apply to the situation here. While the matter is not entirely clear, if such above-described property or rights are transferred under any part of the act it apparently would be by the terms of section 60.

Assuming that position to be sound, we are then faced with the question whether, in the present circumstances, it is proper for us to order the assets of the testator's trust distributed to the English hospitals through either the original or new boards or committees, or whether the act has in effect brought about a failure of the gifts involved. The question is not an easy one, but as applied to the present situation arising out of the estate of the testator we are of the opinion that the health act by reason of its provisions has unavoidably brought about a condition which makes

it impossible for us to be reasonably certain that the funds will be applied by the hospital boards for the purposes of these particular gifts as provided for in the approved scheme created under the testator's will, and therefore that a failure of such gifts under the will has been caused.

We are led to that conclusion, first, by the general tenor and apparent all-embracing purposes of the health act as hereinbefore briefly indicated; and second, by language contained in section 60 (2) of such act. The phrase "so far as practicable" in that section obviously permits the new board or committee great latitude in the application of sums thus paid to it and on the other hand removes such powers and control from the original hospitals. As we read the act, such board or committee is to be the sole judge of what may be practicable in any given case. In fact it might be decided that it was not practicable to apply *any* of the money for the purposes specified in the trust as set up. In such circumstances if the sums were to be paid over to the new board or committee under the act, they would thus be beyond the control of this court even though the testator's intent was to be entirely disregarded.

Furthermore, as we are now concerned with teaching hospitals, it is conceivable that money turned over to the new board or committee might be used under the health act to benefit other hospitals comprising that group and not alone for the hospitals designated in the scheme. The new governing boards, each of which administers a group of nationalized teaching hospitals under the provisions of that act, are very different bodies from the individual, private, charitable institutions which were selected by the executrix of the testator's will to carry out his intent. There is no express requirement in section 60 (2) of the act that any such board or committee *must* apply these funds for the purposes specified in the trust instrument.

In support of their position, the English hospitals have made certain contentions to which we will refer. In our

opinion the fact that some affidavits filed by them tend to show that the hospitals in question are being conducted in substantially the same general manner as before the health act was passed is not determinative herein. Under that act the powers of the health minister, acting individually or through the new boards and committees, are apparently so comprehensive that changes in the management or handling of funds of the hospitals could easily and speedily be made.

Such hospitals have cited the case of *In re Kellner's Will Trusts,* 1 Ch. Div. (1950) 46, as being favorable to them. That case does hold in substance that under section 60 of the health act a one-eighth share of residue of an estate passed to a board of governors of a teaching hospital. Beyond that point, however, the case does not seem to us to be applicable. It would appear from the decision that the one-eighth interest under the testatrix' will was an outright bequest to the hospital without conditions and not for any express purpose. In that respect it differs from the instant case where the gifts are limited to specific uses and by express conditions as part of the essence of the gifts, so that obviously they would fail if such uses and conditions were not to be fulfilled.

Further, it is our opinion that the alleged continuing existence of the original hospital corporations does not in itself prevent a failure of the gifts in question. Whether or not such original corporations do exist is not entirely clear. Possibly they may for certain special purposes. However, the health act provides that the original governing boards no longer hold property, real or personal, tangible or intangible, for hospital purposes. Under sections 6, 7, 59 and 60, of the act all hospital property, present or future, vests in the minister of health or in the new governing boards which are subject to his direction and control. If the original hospital corporations do exist, they would appear ordinarily to be bare legal entities or mere conduits without any right or control over the hospital

property or funds and without power to receive in the future and to control and apply those gifts for hospital purposes as set out in the will.

Finally we are unable to agree with the arguments of the English hospitals that, even if in the circumstances the gifts to them have failed, they are entitled to have this cause remanded to the superior court for the application of the doctrine of *cy pres*. It may be granted that the testator's will reveals a general charitable intent, *Pell* v. *Mercer, supra,* thus meeting that requirement for the application of such doctrine. However, in Section XI of his will the testator named the respondent churches as his residuary legatees saying: "so that in case any of my preceding gifts, specially my gifts to Public purposes should fail * * * my property shall surely go, in such event, to the work of establishing the Knowledge & following of Jesus Christ among our American People." Such provision in effect obviates the application of that doctrine since the testator himself shows clearly his own intent and the alternative disposition of his property in the event of the failure of the gifts referred to.

In the circumstances we see no reason why the above-expressed intent of the testator should not be carried out. It is generally held that when a testator makes a specific alternative bequest to take effect if a primary charitable one fails, the doctrine of *cy pres* is not applied, but the estate is distributed in accordance with the testator's express direction. *Rhode Island Hospital Trust Co.* v. *American National Red Cross,* 50 R. I. 461; *Webster* v. *Wiggin,* 19 R. I. 73. 2 Restatement, Trusts §§401 (f), 413 (b). In the case first cited the court used the following language at page 465 of its opinion: "Although it is apparent that the donor had a general rather than a specific charitable intent, the *cy pres* doctrine is inapplicable where, as in this case, the donor has made other specific disposition of the fund." It may be noted that in the present instance there

is other specific disposition and the alternate beneficiaries are also charities.

Having determined, in view of the conditions appearing herein and the changes resulting from the passage of the health act, that the gifts to the English hospitals have failed and that this cause is not a proper one for an application of the *cy pres* doctrine under our statute, we find that the assets of the trust now in the hands of the complainant trustee and ready for distribution should be paid, in accordance with the express direction of the testator as contained in Section XI of his will, in equal amounts to The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America and to the Board of Home Missions of the Presbyterian Church in the United States of America as residuary legatees thereunder.

On November 9, 1951 the parties may present to this court a form of decree, in accordance with this opinion, to be entered in the superior court.

*Sheffield & Harvey, William R. Harvey, J. Russell Haire,* all of Newport, for complainant.

*Hinckley, Allen, Salisbury & Parsons, Frank L. Hinckley, Matthew W. Goring, Robert J. Nordstrom,* all of Providence, for respondents Board of Governors of the London Hospital, Governors of the London Hospital, Board of Governors of The Royal Free Hospital, and The Elizabeth Garrett Anderson Hospital.

*Davies, Hardy, Schenck & Soons, Dermod Ives, John H. Barber, Charles L. Herterich, Jr.,* all of New York City, for respondent The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America.

*Coombs & Wilson,* of Brooklyn, New York, for respondent Board of Home Missions of the Presbyterian Church in the United States of America.

*William E. Powers,* Atty. Gen., Robert A. Coogan, Ass't Atty. Gen., Providence, for State of Rhode Island.